UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Cr. No. 19-270 (PJS)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | **DEFENDANT'S POSITION** |
| vs. | ) | **REGARDING SENTENCING** |
| | ) | |
| JOSIAH RAUL MOSQUEDA, | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

Mr. Mosqueda will appear before this Court to be sentenced at a future date for the

offense of *Production and Aiding and Abetting in Production of Child Pornography*, in

violation of 18 U.S.C. § 2251(a) and (e).  In the plea agreement, Mr. Mosqueda and the

government agreed that this offense is punishable by a minimum of 15 and a maximum

of 30 years in prison.  The parties also agreed that the United States Sentencing

Guidelines establish the following:

32    Base offense level

+2    Victim under 16 years of age

+2    Offense involved commission of sexual act or sexual contact

+2    Mr. Mosqueda knowingly engaged in distribution

+2    Offense involved a computer or interactive computer service to solicit
      participation by a minor in sexually explicit conduct

−3    Acceptance of responsibility

+2    Mr. Mosqueda abused a position of trust

(+2)   Government believes two points should be added because Mr. Mosqueda used or attempted to use a minor to commit the offense or avoid detection of or apprehension for the offense; Mr. Mosqueda objects to this enhancement; the PSI did not include this enhancement

+5   Mr. Mosqueda engaged in a pattern of activity involving prohibited sexual conduct with a minor

Mr. Mosqueda has absolutely no criminal history.  With a criminal history category I and an adjusted offense level of 44 (according to the defense) or 46 (according to the government), he is facing possible life imprisonment, which is adjusted to 360 months due to the statutory maximum.  The pre-sentence investigation report (PSI) did not impose the 2 points for use of a person under 18 years of age or the 2 points for abusing a position of trust, totaling 42 points, which is 360 months to life, adjusted to 360 months due to the statutory maximum.

In the post-*Booker* world of federal sentencing, the sentencing judge's consideration of the appropriate sentence no longer ends after applying the various Guideline adjustments to the base offense level, calculating the defendant's criminal history score, and locating the point on the grid where the two calculations intersect.  This Court may now consider Mr. Mosqueda's case within this paradigm when determining the appropriate sentence.  Mr. Mosqueda's offense conduct was of a nature that requires the Court impose a sentence that is both a punishment and a deterrent.  His case presents this Court with a unique set of circumstances where a sentence of 15 years in prison would be sufficient, but not greater than necessary, to comply with the purposes of sentencing outlined in 18 U.S.C. § 3553(a), and, in addition, that such a sentence would fully effectuate Congress' explicit directives to courts in imposing a statutorily reasonable

2

sentence.  For the reasons set forth below, Mr. Mosqueda, by and through his attorney, Ryan Garry, asks this Court to sentence him to the mandatory minimum 15 years in prison.

## PRE-SENTENCE INVESTIGATION

Mr. Mosqueda agrees with the PSI (pp. 9–10, ¶30) that the 2-point enhancement for use of a person under 18 years of age does not apply.  *See* USSG § 3B1.4, Application Note 2 ("Do not apply this adjustment if the Chapter Two offense guideline incorporates this factor.  For example, if the defendant receives an enhancement under §2D1.1(b)(16)(B) for involving an individual less than 18 years of age in the offense, do not apply this adjustment.").  The age is accounted for in a 2-level enhancement under USSG § 2G2.1(b)(1)(B) (PSI, p. 8, ¶23).

## BACKGROUND

Mr. Mosqueda was born in St. Cloud, Minnesota in 1992 and grew up in Maple Grove with his parents and two younger sisters.  He had a good start to his childhood.  He played sports with his father and was close with his mother.  Once he started middle school, his parents' relationship deteriorated.  His father was manipulative and abused his mother.  During their separation, his father attempted to kidnap Mr. Mosqueda and his siblings from school.  Growing up Mexican-American, Mr. Mosqueda struggled with his culture.  His mother was emotionally supportive, but his father believed that any mental health issues should only be dealt with by praying and seeing faith leaders, not by seeking professional help.  As Mr. Mosqueda continued to grow, his relationship with his father declined.  Mr. Mosqueda never felt like he was good enough for his father, was not

athletic enough, and had no interest in girls.  It became very clear to Mr. Mosqueda that he was not the son his father wanted.  Further, Mr. Mosqueda's father was disappointed that his skin tone, though Mexican, was very light.  It became a source of resentment towards Mr. Mosqueda.

After the divorce in 2006, Mr. Mosqueda primarily lived with his mother.  When he did spend time with this father, his father would talk about how Mr. Mosqueda's mother and her parents were evil and how the Chinese government was spying on him. He was emotionally and physically abusive.  Eventually, Mr. Mosqueda did not have to go see his father anymore due to the abuse.  For a time, Mr. Mosqueda lived with his maternal grandparents, with whom he is still very close.  Culturally, as the first-born grandson, Mr. Mosqueda is responsible for caring for his grandparents as they age and then to make funeral arrangements after their passing.  He hopes to be able to fulfill these responsibilities one day when released.

While in high school, in 2008, Mr. Mosqueda's mother re-married.  Mr. Mosqueda sees his stepfather as a wonderful father figure.  He also gained a stepsister.  Throughout high school, Mr. Mosqueda struggled with his sexuality.  He eventually came out as gay. He struggled with this transition in high school and was teased and bullied.  But outside of school, his family was very supportive.  His mother already knew and noted that Mr. Mosqueda himself was probably the last person to realize he was gay.  Mr. Mosqueda graduated Totino-Grace High School in 2011 with a 3.53 GPA.  He had been a good student, taking AP classes, honor classes, and a college course.

Mr. Mosqueda then went onto St. Olaf College and majored in sociology/ anthropology with a minor in women's and gender studies. During his time there, he did a study abroad to Jordan for six months. Sadly, while at college, Mr. Mosqueda's sister's friend committed suicide after coming out as gay while in high school. This was very difficult for Mr. Mosqueda as he saw some of himself in this student. He realized that he wanted to spend his life helping LGBTQ youth with their sexuality and finding acceptance. He graduated from St. Olaf in 2015 with a 3.11 GPA.

As a young adult, Mr. Mosqueda had two instances of sexual assault. In the first, a male masturbated him without his consent; Mr. Mosqueda was 19 years old. In the second, at age 21, Mr. Mosqueda's then-boyfriend engaged in painful anal sex without protection or lubrication (which Mr. Mosqueda had requested be used), and which resulted in injuries. His boyfriend would not stop at Mr. Mosqueda's request. Sadly, Mr. Mosqueda started developing a sense that this was how it would be as a homosexual male, that he would be abused.

After college, Mr. Mosqueda volunteered for two years in the AmeriCorps and worked in various schools. His first year was at Roosevelt High School, and then he was placed at Olson Middle School in North Minneapolis. He greatly enjoyed his time in the AmeriCorps. He had a caseload of 20–30 youth and helped them with attendance issues and homework. He was paid very little and lived at home during this time.

Mr. Mosqueda has always been employed. After he left the AmeriCorps, he worked briefly at a homeless youth shelter. He started working part time at a religious shop in the summer of 2015 and continued working there until his arrest. He also worked

part time doing sales for the Minnesota UFC soccer team beginning in the summer of 2015 until the summer of 2018.

In September 2017, Mr. Mosqueda started a master's degree in social work at Augsburg College; he was still in the program until his arrest with a 3.59 GPA and 20 credits. He was hired at Hiawatha Academy as a paraprofessional from November 2017 until July 31, 2018. He ceased his employment because he needed to complete an unpaid internship for his master's program, so he stayed as a volunteer. He worked on curriculum for Genders & Sexualities Alliance for Latino and other students of color. He wanted the students to learn about their cultures, including LGBT students of color. Mr. Mosqueda was and remains very passionate about LGBT Latino and other students of color's rights and cultures.

On March 8, 2019, shortly before Mr. Mosqueda was arrested, his father suddenly passed away. His health was poor and he died from organ failure. Prior to his death, Mr. Mosqueda had worked to improve their relationship. They were able to attain a small piece of resolution before his father's passing. Despite his difficult relationship with his father, Mr. Mosqueda still grieves his loss.

While in custody, Mr. Mosqueda has spent significant time thinking about what he can do during and after his prison sentence. He is semi-fluent in Spanish, understands some Mandarin Chinese, and speaks a small amount of Arabic. He plans to study these languages while in prison. He is also working on learning Nahuatl, which is an ancient Aztec language and is the largest indigenous language in Central and North America; Mr. Mosqueda is part Aztec. While serving his sentence, he hopes to become a tutor in the

prison education department and would like to take some courses in writing.  So far, he

has read nearly 100 books while incarcerated at the Sherburne County Jail.  He plans to

continue working on his physical health, mental health, and spiritual health once

committed to prison.  Mr. Mosqueda hopes to attain a paralegal certificate in prison

through Adams State University, which works with inmates, and when released, work for

an immigration firm to help immigrant families.

## THE OFFENSE CONDUCT

The plea agreement establishes that Mr. Mosqueda engaged in sexually

inappropriate conversations with minor males as well as solicited and received sexually

explicit images from the minor males.  Mr. Mosqueda persuaded Minor #1, via social

media and electronic communication platforms, to engage in sexually explicit conduct for

the purpose of producing visual depictions of that conduct, and then received those

images via the Internet.  Mr. Mosqueda also admitted to other relevant conduct.

## ARGUMENT

### I.  Mr. Mosqueda's 3553(a) Factors Warrant a 15-Year Prison Sentence.

A sentence of 15 years in federal prison for someone with no criminal history is

sufficient to satisfy the 3553(a) factors.  This Court must consider a number of factors in

determining a sentence that is sufficient but not greater than necessary to accomplish

sentencing purposes, including the federal sentencing guidelines and 3553(a) factors.

*United States v. Booker*, 543 U.S. 220, 245–46 (2005); *Kimbrough v. United States*, 552

U.S. 85, 90, 111 (2007).  A sentencing court must consider the following factors as set

forth in 18 U.S.C. § 3553(a) in order to arrive at a sentence:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.
(3) the kinds of sentences available;
(4) the advisory guideline range;
(5) any pertinent policy statements issued by the Sentencing Commission;
(6) the need to avoid unwarranted sentence disparities; and
(7) the need to provide restitution to any victims of the offense.

Upon consideration of these factors, the court then must impose a sentence that is sufficient but not greater than necessary to satisfy the purposes of sentencing, to wit, "just punishment, deterrence, protection of the public and the rehabilitation of the defendant." *United States v. Lupton*, No. 07-CR-219, 2009 WL 1886007, *1, 4 (E.D.Wis. June 29, 2009). The sentencing judge's responsibility, then, has become to "canvass all of the many features of the case that bear on the culpability of the defendant." *United States v. Ovid*, No. 09-CR-216 (JG), 2010 WL 3940724, *1, 6 (E.D.N.Y. Oct. 1, 2010). The Sentencing Commission has considered some of these features, but not all. Nonetheless, this Court's consideration must be guided by the overarching explicitly stated command that the ultimate sentence to be imposed should be no greater than necessary to satisfy the statutory purposes of sentencing.

After consideration of all of the mitigating factors in this case, it is clear that a sentence of 15 years in prison is sufficient to satisfy the statutory purposes of sentencing in this case.

II.   **Specific Bases for Downward Departures and Variances for Mr. Mosqueda.**

    A.  **The advisory guidelines range is too harsh, excessive, and "greater than necessary"**

Mr. Mosqueda is facing a sentence of 15–30 years and he has no criminal history.

Such a harsh sentence for a first-time offender is extremely harsh and excessive.  The

Supreme Court in *Pepper v. United States* stated:

> "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." *Williams*, 337 U.S. at 247, 69 S.Ct. 1079; see also *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55, 58 S.Ct. 59, 82 L.Ed. 43 (1937) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender").

562 U.S. 476, 487–88 (2011).

In addition, Mr. Mosqueda is 28 years old.  If sentenced to the mandatory

minimum sentence, he will be 43 years old when he is released from federal custody (not

accounting for good time).  While Mr. Mosqueda's crime is very serious, and he certainly

understands its gravity, anything beyond 15 years is excessive and not necessary.

    B.  **Federal court sentences are much harsher than state court sentences**

If Mr. Mosqueda were prosecuted and sentenced in state court, instead of federal,

for use of a minor in a sexual performance under Minn. Stat. § 617.246, subdivision 2(a),

he would be facing a statutory maximum of 10 years and a stayed sentencing guideline

range of 24 months (severity level E, 0 criminal history).  MINN. SENT. GUIDELINES IV.B.

If the minor was under 13 years of age, the statutory maximum increases to 15 years.

MINN. STAT. § 617.246, subdiv. 2(b).  The guideline range for that offense would be

stayed 36 months (severity level D, 0 criminal history).  MINN. SENT. GUIDELINES IV.B.

Even murder and criminal sexual conduct state cases that are much more serious

than the facts of Mr. Mosqueda's federal prosecution require less prison time in state

court.  For example, a first-degree criminal sexual conduct case (the most serious of all

state criminal sexual conduct cases) encompasses a statutory maximum of 30 years and a

presumptive sentence of 144 months (12 years) in prison.  MINN. STAT. § 609.342,

subdiv. 2.  The guideline range for that offense is 144–172 months in prison.  MINN.

SENT. GUIDELINES IV.B.  In comparison, a third-degree murder case in state court with

two criminal history points has a presumptive sentence of Mr. Mosqueda's statutory

minimum: 15 years in prison.  MINN. SENT. GUIDELINES IV.A.  In other words, a

defendant who *killed* another person, and who has a criminal history, would be looking at

the same sentence as Mr. Mosqueda's mandatory minimum in federal court.

Thus, the 15-year mandatory minimum sentence is more than sufficient to achieve

the purposes of sentencing.

### C.  This Court may sentence below the guidelines due to policy disagreement with the guidelines and the offense level assigned

This Court has the discretion to vary from the guidelines "based on a *policy*

disagreement with them, and not simply based on an individualized determination that

they yield an excessive sentence in a particular case." *Spears v. United States*, 555 U.S. 261, 264 (2009).

The Sentencing Guidelines note in several places that when a base offense level encompasses a factor, then there should not be an additional enhancement for the same factor. *See, e.g.*, U.S.S.G. §2X4.1, comment. (n.2) ("The adjustment from §3B1.2 (Mitigating Role) normally would not apply because an adjustment for reduced culpability is incorporated in the base offense level."); U.S.S.G. §3A1.1, comment. (n.2) ("Do not apply subsection (b) if the factor that makes the person a vulnerable victim is incorporated in the offense guideline.  For example, if the offense guideline provides an enhancement for the age of the victim, this subsection would not be applied unless the victim was unusually vulnerable for reasons unrelated to age."); U.S.S.G. §3A1.2, comment. (n.2) ("Do not apply this adjustment if the offense guideline specifically incorporates this factor.").

### i.  Two points for the offense involving a computer

The defense disagrees with the policy behind the two-point enhancement for use of a computer.  Pursuant to the plea agreement, 2 levels are added because the offense involved the use of a computer or interactive computer service to solicit participation by a minor in sexually explicit conduct under U.S.S.G. §2G2.1(b)(6)(B) (Plea Agreement, pp. 6–7).  Given today's world where nearly every person spends the majority of the day on their cell phone or computer, any child pornography offense committed involves the use of a computer or interactive computer service.  Because most, if not all, child pornography offenses occur using a computer, such conduct is already adopted in the

offense and base offense level.  Thus, Mr. Mosqueda should receive a downward departure or variance due to the inclusion of this two-level enhancement.

### ii.  Five points for multiple victims or images

The defense disagrees with the policy behind the five-point enhancement for multiple victims or images.  Similar to the previous argument, very few, if any, child pornography cases involve only one picture or one victim.  Given the prevalence of child pornography and the ease of downloading images or videos in today's world, nearly every case involves more than one image or victim.  The undersigned cannot recall one case he has defended involving child pornography that involved only one image or one video.  Indeed, modern smart phones contain a feature to take a "burst" photo where one click of the button yields multiple photos.  Thus, Mr. Mosqueda should receive a downward departure or variance due to the inclusion of this five-level enhancement, as the federal guidelines have considered this issue when suggesting a range.

### D.  Early Adversity

As explained above and shown in Mr. Mosqueda's acceptance of responsibility statement, he struggled very much in his relationship with his abusive father.  He was made to feel that he was never good enough.  His father physically abused him and his mother.  In later years, he struggled in school with his sexual orientation.  He was raped in his young adult life and experienced the suicide of a family friend.  All of these adversities shaped Mr. Mosqueda's life.

"Childhood physical abuse, sexual abuse, and neglect have both immediate and long-term effects.  Different types of abuse have a range of consequences for a child's

later physical and psychological well-being, cognitive development, and behavior."[1]   One study showed that, intellectually, individuals at approximately 29 years of age scored significantly lower on the IQ scale if they had been abused or neglected.[2]   Regarding romantic relationships, individuals who had been abused or neglected were less likely to have a stable marriage and experienced higher rates of divorce and separation.[3]   Further, individuals who had been abused or neglected had a higher rate of criminal behavior.[4]

### E.  The Need for Deterrence

While it is important to deter crime, any prison sentence Mr. Mosqueda receives will have limited impact in his particular case.  Said another way, prison has little <u>specific</u> deterrent value given his age and the consequences he has suffered thus far.  "Prison is an important option for incapacitating and punishing those who commit crimes, but the data show *long prison sentences do little to deter people from committing future crimes*" (emphasis added).[5]   Evidence suggests "that short sentences may be a deterrent. However, a consistent finding is that increases in already lengthy sentences produce at best a very modest deterrent effect."[6]

First, research has shown that *being caught* is more of a deterrent than *punishment*.[7]   Simply being caught and indicted is more of a deterrent to both Mr. Mosqueda and others than a long sentence.  Second, prison sentences do not particularly

---

[1] Cathy Spatz Widom, Childhood Victimization: Early Adversity, Later Psychopathology, National Institute of Justice Journal 3 (Jan. 2000), https://www.ncjrs.gov/pdffiles1/jr000242b.pdf.
[2] Id. at 4.
[3] Id. at 5.
[4] Id.
[5] U.S. Department of Justice, National Institute of Justice, Five Things About Deterrence 2 (May 2016), https://www.ncjrs.gov/pdffiles1/nij/247350.pdf.
[6] Id.
[7] Id. at 1.

deter future crime: "Inmates learn more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment."[8]  Mr. Mosqueda has spent over 1 year at the Sherburne County Jail (he was arrested and detained on March 27, 2019).  Being sent to a federal prison, especially a high-security prison with more sophisticated criminals, opens Mr. Mosqueda up to learning more crime techniques.  Third, rather than punishment, any police presence that increases the chance of being caught is more of a deterrent than punishment.[9]  Longer sentences can increase recidivism.[10][11]

Fourth, increasing penalties does not generally deter crime because criminals often do not know what the penalty is for the crime they are committing.[12]  It makes sense that people do not research the statutory sentencing and sentencing guidelines before committing a crime.  Therefore, increasing penalties is not going to deter crime—it merely fills the prisons and eats up taxpayers' dollars.

### F.  Remorse

Mr. Mosqueda has expressed sincere remorse in his statement accepting responsibility, to the undersigned, and to Dr. Peter D. Marston, Ph.D., L.P. during his psychosexual evaluation.

At his own expense, Mr. Mosqueda completed the psychosexual evaluation with Dr. Marston in 2019 while in custody.  During the interview, Mr. Mosqueda took

---

[8] Id.
[9] Id.
[10] Id.
[11] Approximately 12 to 24% of sex offenders reoffend, but not usually with a sexual or violent offense.  CSOM Fact Sheet: What You Need to Know About Sex Offenders, p. 3, https://cepp.com/wp-content/uploads/2020/01/1-Fact-Sheet-.pdf.
[12] Id.

responsibility for his behavior and "expressed regret and what appeared as very sincere remorse.  He said he is deeply disappointed in himself and for the harm he has caused to the victims who should have expected and received far better conduct from him" (p. 3).  He acknowledged that "he broke the law and broke his own moral code" (p. 13).  Dr. Marston writes:

> For various reasons Mr. Mosqueda was not able to sustain clear boundaries in his work and relationships with these teenage males and then got himself involved in the present range of misconduct and did this while he had been hired as and represented the helping/teaching profession. He took responsibility for his behavior and expressed horror at his behavior, felt he was a 'monster' in this behavior and is profoundly disappointed in himself and remorseful about his misconduct and the betrayal it was of his stewardship role and his values and integrity. Mr. Mosqueda wants to begin treatment as soon as possible and to make sure he never harms anyone again. He said he is deeply sorry for harming the victims, their families, the organizations whose trust he abused in his employment by them, his family, friends and spiritual advisors.

(p. 28).

While Mr. Mosqueda was in the throes of his misconduct, he knew he needed help.  He believed that he could not disclose his conduct or desires to a therapist without the report being sent to law enforcement.  While certainly not offered as an excuse, he felt he was in a Catch-22: he needed help to stop his behavior, but could not ask for help without subjecting himself to criminal penalty.  Mr. Mosqueda immediately expressed to the undersigned his relief at being arrested in this case.[13]  He felt that he might finally get the help he needs.  He knows he is sick and is motivated to get better.

---

[13] Indeed, Mr. Mosqueda delayed the continued pending Indictment on numerous occasions, as requested by the government, so that the matter could be resolved without further litigation and delay.

### G. Prison time is more significant for a person with little criminal history

Mr. Mosqueda has no criminal history.  He has spent over 1 year in jail, which can be considered "hard-time" given his incarceration has been in Sherburne County (discussed below).  These factors are significant for a 28-year-old man who has never served any state or federal prison sentence.

### H. Stigma of a felony conviction

"The stigma of a felony conviction is permanent and pervasive." *United States v. Smith*, 683 F.2d 1236, 1240 (9th Cir. 1982).  This will affect Mr. Mosqueda in obtaining housing, getting a job, volunteering, and so on when he is released.  "Sometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed." *United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012).

### I. Mr. Mosqueda is unlikely to reoffend and poses no danger to the public

The likelihood that Mr. Mosqueda "will engage in future criminal conduct [is] a central factor that district courts must assess when imposing sentence." *Pepper*, 562 U.S. at 492.  Mr. Mosqueda, upon release, will be a law-abiding, productive member of society accountable to his probation agent.  He desires to get a paralegal certificate and work for an immigration law firm helping marginalized people.  If this Court imposes a 15-year sentence, Mr. Mosqueda will be 43 years old when released, and the chances of reoffending given his punishment thus far is unlikely especially upon completion of court-ordered treatment.  Any concerns of "danger to the public" will be secured by the necessary conditions of probation.

**J.   Incarceration beyond 15 years is not needed to protect the public**

Mr. Mosqueda is already 28 years old.  He has already been incarcerated for more

than 1 year.  Society is not protected with Mr. Mosqueda in prison beyond 15 years.  He

has learned his lesson, will get help, and will not re-offend.

**K.   A 15-year prison sentence with probation or supervised release with conditions is an onerous punishment and is sufficient to effectuate the purposes of sentence**

"It may *very often* be that release on probation under conditions designed to fit the

particular situation will adequately satisfy any appropriate deterrer or punitive purpose."

*United States v. Edwards*, 595 F.3d 1004, 1016, n.9 (9th Cir. 2010) (citation omitted).

Any terms of supervised release or probation will be onerous and will certainly be a

sufficient punishment for Mr. Mosqueda.

**L.   Society will benefit more from Mr. Mosqueda working and supporting his grandparents than his incarceration**

As discussed below, society will shoulder a massive financial burden to

incarcerate Mr. Mosqueda.  A 30-year sentence could cost society $727,860 to

$1,210,410.  Society will benefit far more if Mr. Mosqueda is imprisoned for 15 years

($363,930 to $605,205) and can then return home and obtain employment to support

himself and care for his family.  Further, if Mr. Mosqueda is an old man when his is

released, he will need to rely on public assistance in his old age because he will not have

had the time in his working life to save up for retirement.

17

### M. The Court's sense of what is fair and just

Is 15 years enough?  Abraham Lincoln stated, "I have always found that mercy bears richer fruits than strict justice."  "Although the sentencing judge is obliged to consider all of the sentencing factors outlined in section 3553(a), the judge is not prohibited from including in that consideration the judge's own sense of what is a fair and just sentence under all the circumstances.  That is the historic role of sentencing judges, and it may continue to be exercised, subject to the reviewing court's ultimate authority to reject any sentence that exceeds the bounds of reasonableness."  *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).  In this case, a sentence of 15 years is fair and just.

### N.  Restitution

Pursuant to the plea agreement, Mr. Mosqueda agreed to pay at least $3,000 to any child pornography victim of whose photo(s) or video(s) he possessed, distributed, received, trafficked, or produced as well as $10,000 to any of the victims enumerated in the plea agreement.  At this point, three child pornography victims have come forward and three other victims have come forward.  It is the defense's understanding, based upon the government's restitution memorandum and the parties' discussions, that Mr. Mosqueda will receive a restitution order awarding $3,000 to each of the three child pornography victims and $10,000 to the other three victims, totaling $39,000.

Mr. Mosqueda would like to pay restitution in full to the victims in this case to attempt to make them whole.  The longer the prison sentence the less likely it will be that he will be able to make the payments.  Mr. Mosqueda estimates that in prison, he will start making 12¢ per hour as a tutor.  If he works 30 hours per week and 50 weeks per

year, he would make $230.00 per year.  That pay could increase, but he estimates the maximum would be $600.00 per year.  The sooner he is released from prison, the sooner he can make a living wage and pay more to the victims.

## III.    Similar Cases

A review of other recent child pornography cases in the District of Minnesota shows that a sentence of 15 years is sufficient in Mr. Mosqueda's case:

- *United States v. Marcus Alexander Hinkle*, 18-CR-185 (SRN): pled guilty to two counts of *Production of Child Pornography* and received a sentence of 20 years in prison and supervised release for life

- *United States v. Barton George Scott*, 18-CR-217 (WMW/KMM): pled guilty to one count of *Production of Child Pornography* and one count of *Penalties for Registered Sex Offenders* and received a sentence of 15 years on the production count consecutive to 10 years on the registration count

- *United States v. Kevin James Petroske*, 17-CR-116 (PJS/LIB): found guilty at trial of eight counts of *Production and Attempted Production of Child Pornography* and one count of *Possession of Child Pornography* and received a sentence of 20 years on each count, all concurrent

In a recent District of Minnesota case, a defendant by the name of Marcus Hinkle pled guilty to two counts of *Production of Child Pornography* and received a sentence of 20 years in prison and supervised release for life.  *United States v. Marcus Alexander Hinkle*, 18-CR-185 (SRN).  Mr. Hinkle pled guilty to using an Instagram account to contact minors and pressure them into sending pictures and videos of their penis and of

them masturbating (Dkt #32, Plea Agreement, p. 2–3). He lied about his age, claiming to be 15 years old (*id.*). Mr. Hinkle explained to the minors how to take the photos and use the Instagram account settings (*id.*). For at least one minor, Mr. Hinkle threatened to post the photos if the minor refused to send more photos and videos (*id.* at p. 4). Mr. Hinkle did, in fact, distribute photos of one of the minor's penis in a group chat (*id.*). Mr. Hinkle estimated he obtained photos and recordings from at least 13 other minors (*id.*). The parties agreed there was a 30-year statutory maximum sentence and a mandatory minimum of 15 years (*id.*). The parties agreed that the guidelines were life (*id.* at p. 8). On June 26, 2019, the Honorable Susan R. Nelson imposed 20 years in prison, concurrent on both counts, and a lifetime supervised release term (Dkt #63, Judgment in a Criminal Case).

In another case, a defendant named Barton Scott was charged with 26 counts related to child pornography and fraud in connection with computers, pled guilty to one count of *Production of Child Pornography* and one count of *Penalties for Registered Sex Offenders*. *United States v. Barton George Scott*, 18-CR-217 (WMW/KMM). Mr. Scott pled guilty to using Snapchat to befriend a minor, convinced the minor to provide her password, and he accessed a private portion of her Snapchat account (Dkt #29, Plea Agreement, pp. 2–3). Then, Mr. Scott threatened to publish the minor's private photos if she did not provide him with pornographic images and videos of her (*id.* at p. 3). Due to the threats, the minor took sexually-explicit photos and videos of herself and sent them to Mr. Scott (*id.*). Mr. Scott also admitted to knowing he was required to register as a sex offender due to a prior conviction (*id.*). In addition, Mr. Scott admitted to engaging in

similar conduct with dozens of other individuals, many minors, gaining access to their

Snapchat accounts and demanding images and videos of child pornography (*id.* at pp. 3–

4).  The parties agreed there was a 30-year statutory maximum sentence and a mandatory

minimum of 15 years for the production of child pornography count and a mandatory

consecutive 10-year sentence for the registration count (*id.* at p. 5).  The parties agreed

that the guidelines were 360 months to life for the production count accounting for a

criminal history category III (*id.* at p. 8).  On September 19, 2019, the Honorable

Wilhelmina M. Wright sentenced Mr. Scott to 15 years on the production count

consecutive to 10 years on the registration count (Dkt #54, Judgment in a Criminal Case).

In another case, Kevin Petroske was found guilty at trial of eight counts of

*Production and Attempted Production of Child Pornography* and one count of *Possession*

*of Child Pornography*.  *United States v. Kevin James Petroske*, 17-CR-116 (PJS/LIB).

Mr. Petroske had been allegedly peering in a residence and was subsequently subjected to

a search warrant.  *United States v. Petroske*, 928 F.3d 767, 770 (8th Cir. 2019).  The

search revealed a laptop containing various surreptitious recordings of minors in their

homes unclothed, such as before or after taking a shower.  *Id.*  The laptop also contained

a document showing how he produced the videos and obtained sexual gratification.  *Id.*

On February 27, 2018, the Honorable Patrick J. Schiltz sentenced Mr. Petroske to 20

years on each count, all concurrent (Dkt #100, Judgment in a Criminal Case).

These cases show that even in a case where the defendant did not accept

responsibility by proceeding with a jury trial, 20 years was sufficient.  In Mr. Mosqueda's

case, he accepted responsibility immediately, pled guilty to the sole count charged,

expressed remorse, and will accept his sentence.  Thus, a 15-year sentence is sufficient.

## IV.   Mr. Mosqueda's Acceptance of Responsibility

Mr. Mosqueda accepted full responsibility in this case.  He pled guilty to the

offense as requested by the government, and wrote a statement:

> From as early as 2012 through January 2019 in the State and District of
> Minnesota, I used social media and electronic communication to
> communicate with minor males to engage in child pornography.  This
> violated Title 18, United States Code, Section 2251(a) and (e).  I am deeply
> sorry for my actions and for the harm I caused the minor males and anyone
> else affected by my terrible decisions.  I offer no excuse for my actions and
> choices in this case.  Everything I did was of my own doing, and I blame no
> one but myself.  I offer the following background information so this Court
> can understand what led to this offense.
>
> When I was a child, my father was abusive toward me.  I was raised feeling
> I was simply not good enough for him no matter what I did or how hard I
> tried.  Had I known better, I would have gotten some help to assist in my
> depression that sprung from my father's disappointment in me as his son.
> In my family's culture, getting mental health treatment was not an option
> because it was perceived as weakness and the belief that matters of the
> mind were for God's help alone.
>
> As I grew, I learned I was gay, though my mother said I was the last one to
> know this.  She fully supported me as did most of my family.  However, I
> did not have any gay role models to guide me in life, so I was at the mercy
> of anyone I could find.  When I was 20 years old, I was sexually abused by
> another male.  I was horrified, but I did not know what to do.  This was my
> first true experience as a gay man.  A couple months later, I was raped by
> my boyfriend who was also emotionally abusive.  These two experiences
> were traumatizing, and my feelings of lack of self-worth stayed with me for
> a long time.
>
> I continued along my path in life, meeting other gay men, learning and
> growing with them.  I had many healthy relationships with adult men, both
> romantic and platonic.  I realized that while I was attracted to adult men, I
> was also attracted to post-pubescent males.  I knew this was wrong and
> unhealthy, but given my family's culture of not seeking help and the fear

that I would be found out, I did not seek help.  I feared that any therapist would have to disclose to law enforcement what I shared.  I know I should have sought help, but I did not.

While I was in college, a friend committed suicide exactly one month after he came out as gay.  This friend was 17 years old, attended the same high school that I had attended, and was very close friends with my sister.  This was extremely traumatic for me and my family.  A young gay man, like me, ended his life because of his sexual orientation and because he was not accepted by his (our) school or his family due to his being gay.  I saw myself in him, and my depression worsened after his suicide.  After his suicide, I visited his grave twice a year every year.  His suicide changed what I wanted to do with my life.  I knew I needed to help young LGBT people accept themselves as who they are.

After college, around age 23 or 24, I started working in AmeriCorps and was placed at Roosevelt High School.  I was involved in the gay-straight alliance.  After I left, I maintained an electronic connection with two of the underage males I met there.  There were also many underage males on social media sites that were designed for adults with whom I communicated during this time as well.

As I got to know the underage males, I discovered that I felt attracted to them, both emotionally and physically.  I knew this was unhealthy.  My attraction started overpowering my good judgment.  I was also depressed, lonely, single, and seeking a relationship that was emotionally, physically, and spiritually meaningful and healthy.  However, I crossed lines, and I committed this offense.  What a terrible, terrible set of decisions I made.

I was not intending harm to any of the minor males.  While I was electronically communicating with these males, I had the sense that I was happy, that the other male was happy, and that we were in a relationship.  Over electronic communication, it was easy to forget about the males' ages.  In addition, I was working long hours and, at times, in school, and so I was not thinking as clearly as I should have been.  I knew it was wrong.  But I still did not feel like I could get help.  My actions snowballed and led to the facts of this case.

Finally, I started working in a middle school.  I was very involved in the LGBT community, especially for Latinos.  I did not want anyone to go through what I had gone through or what my friend who had committed suicide went through.  I wanted these students to grow up knowing who

they were, what kind of relationship was healthy, and how to achieve a happy life. However, again, I crossed lines and committed this offense.

While at Roosevelt and the middle school, I tried hard to maintain boundaries with the students. For example, I did not have any inappropriate communication with students while I was employed at Roosevelt; the illicit conduct occurred after I left. For the middle school, I had no inappropriate communication as an employee. However, when I was a volunteer, I felt a different connection to the school and students, and so my illicit conduct occurred while I was a volunteer and then escalated. In short, I knew the boundaries, tried my best to maintain them, but fell far short. I am guilty.

As a young gay male, I had no role models. My parents had divorced and I did not know any successful gay couples near my age. My parents' relationship was unhealthy and, at times, volatile. There were no relationships in my family that I wanted to try to emulate, except for my grandparents who are far older than I. In short, I did not have a good foundation on which to start a healthy relationship with anyone except for trial and error. Had I been straight, I do not think I would have felt any more confident in knowing how to find a healthy relationship. I do not tell Your Honor these facts as an excuse. I just want to share my background for your consideration.

When I was arrested, I felt relieved. I genuinely cared about the minor males, and I knew that my being caught was good for them and me. My case turned illegal and was criminal, and for that I am deeply sorry. I am hopeful that I can get help while incarcerated, and I am fully committed to recovery. I apologize to this Court and to the males involved in this case. When I started my work, I never thought I would do what I did. I wish there was a way for me to undo the pain I caused, and I hope my sentencing brings some amount of peace to the males I have hurt. I deeply apologize.

## V. Support from the Community

Mr. Mosqueda's family and friends know about his case. While they were shocked by the charge and his admitted behavior, they still love and support him as demonstrated by the numerous support letters attached as well as those quoted below.

Because 18 letters were sent to the undersigned's office on Mr. Mosqueda's behalf, only a few are quoted here:

Theresa Hinnenkamp Lienau, a former theology teacher from Totino-Grace High School, writes:

> My Catholic faith has taught me that people are created in the image and likeness of God, in the image of love, and that we are meant to love and to be loved by others. My faith has also taught me the incredible, healing power of this love and the importance of redemption. I whole-heartedly believe that Jesus did not come for the saint, but for the sinner, and there is nothing that a person can do to put themselves outside of the love of God. Josiah has admitted his guilt; he has sincere remorse for the actions that he has taken. I do believe that he carries within himself the ability to heal, to make amends, and to choose a different path for his future. Please – allow him his future. For his own sake, and for those who love him dearly. . . .
>
> I have known the Mosqueda family for over 10 years. I have found the family to be loving, accepting, kind, and generous. And I have found them to be incredibly honest. They will not shy away from Josiah; they will not turn their backs on him. While holding him accountable to his actions and supporting his treatment, I know that Josiah will be wrapped in the loving arms of his family. As a therapist, I can think of no better scenario. As a person of faith, I see the face of God.

Helen Maddix, a retired theology teacher and school counselor from Totino-Grace High School, writes:

> [Josiah] spent a fair amount of time in my office as he was dealing with his sexual identity at the time. . . . When I worked with Josiah, he struggled with his self concept and was very forth coming about this. So, I know that he understands he made some terrible decisions and is truly sorry for what he has done.
>
> I understand that this is a very serious case against him but I hope, your Honor, and respectfully request that you will consider giving Josiah the minimum of 15 years. He is a good man, a passionate man who cares deeply about those in our society who have experienced discrimination, poverty and injustice.

Jackie Mosqueda-Jones, Mr. Mosqueda's mother, writes:

> The Josiah that I know is an incredibly caring human being who would
> drop anything to help a person in need.  He worked tirelessly as an
> advocate for people who are disenfranchised in this society.  Josiah has a
> heart that has always given to others. . . .
>
> I love my son and my family so much that it often hurts.  I am hurting.  I
> know that many are hurting from this crime.  I am praying that you will
> have it in your heart to hep my son get the help he needs and to help the
> victims also get the help they need so that true healing and rehabilitation
> can happen.  Please consider the 15 year minimum.

Isabella Mosqueda, Mr. Mosqueda's sister, writes:

> Your Honor, you should know what kind of person my brother is- he is the
> kind of person that will sit for hours feeding squirrels, he is the kind of
> person that goes out and purchases warm goods for the homeless
> encampment in Minneapolis even though he was struggling to pay rent, he
> is the kind of person to drop everything and drive in the middle of the night
> an hour down to where I lived to spend the night because I was terrified of
> my ex-boyfriend, he is the kind of person who willingly watches Hello
> Kitty with me when I am so depressed I can't get off the couch because he
> knows that it helps me, he is the kind of person to give away his prized
> possessions to those who cannot afford things, he is the kind of person to
> drive to my parents' house to watch TV with them after a long week of
> work because he understands how important relationships are, he is the
> kind of person to read textbooks for fun because he wants to expand his
> knowledge of the universe, he is the kind of person that fights for the
> injustices of others, he is the kind of person who isn't afraid to show
> emotion and isn't afraid to tell me when he is having a bad day or when he
> is grieving. . . . He is caring and kind and I see a glowing spirit within him
> that has diminished in the past few years, but is still there and I believe can
> still be flourished given treatment and reflection. . . . I would go to the ends
> of the earth for him and I know he would do the same for me. So with that,
> Your Honor, I humbly beg for the sentence of 15 years.

Reverend Phillip Hutchens, Ordained Interfaith Minister, writes:

> Josiah also is a social justice warrior, he was vocal and active for gay rights
> and gender issues.  As a Latino he fought against racism and stereotypes.
> He also championed mental health discussions, and was a bedrock for his
> one sister as she struggled with her own mental wellbeing.

The boy/young man I knew wore compassion and concern for others like armor and was ready to tilt at windmills for others …

I also know he is fearful for his life because of the nature of the charges against him.  We have discussed that possibility and I have agreed to his wishes that I would be the clergy at his funeral.  He is well aware of how deeply he has wounded his family, friends and communities.  We have talked at length about his remorse and shame.  Along with his hope for redemption and a chance to make it right, a conversation we are continuing.

Based on the young man I know, I respectfully request that Josiah receive no more than the mandatory minimum sentencing guide of 15 years and if possible be placed in a facility geographically close to his family.

## VI.   Hard Time

Mr. Mosqueda will also request a hard-time variance to account for the fact that conditions in the Sherburne County jail are spartan in comparison to a lower security prison.  *See United States v. Fiorito*, No. 07-CR-0212(1) (PJS/JSM), 2010 WL 1507645, at *39 (D.Minn. Apr. 14, 2010); *United States v. Edmonds*, 920 F.3d 1212, 1214 (8th Cir. 2019) (district court reduced prison time for "hard time" served pretrial); *United States v. Thomas*, No. 07-297(9) (DWF/JSM), 2012 WL 12896383, *1 (D. Minn. Nov. 12, 2012) (district court granted downward variance for defendant's pretrial custody at Sherburne County Jail).

In a *Star Tribune* article, the Sherburne County Jail was found to be far more difficult to survive than prisons.[14]  The article explains that jails are used for short-term stays pending trial or sentencing while prisons are designed for long-term stays and offer

---

[14] Andy Mannix, Minnesota Prisoners Decry Aimless Limbo in County Jails, Star Tribune, Mar. 13, 2016 (*available at* http://m.startribune.com/state-s-prisoners-decry-aimless-limbo-in-county-jails/371865301).

programming and treatment.[15]  One inmate at Sherburne County jail informed the Star

Tribune:

> In Sherburne, a 15-minute local phone call costs $5.60, or about 15 times
> more than in a DOC facility.  The jail also charges significantly more for
> essential items like toiletries.  He said he's not allowed to hang up pictures
> in his cell and exercise time is limited to 50 minutes a day, far less than at
> DOC facilities. . . . [The inmate had] been ordered to state-mandated
> treatment, but he hasn't received it, which delays his ability to apply for
> work release.  The DOC acknowledged that treatment must be completed
> before an offender can be accepted into work release, but said that county
> jail placement does not prevent an offender from being admitted to
> treatment.  Rather, delays result from a shortage of resources.[16]

Mr. Mosqueda is housed in a protective custody sex offender unit.  He has had two

different cellmates in his 7-foot by 9-foot cell.  His cell consists of metal bunk beds, a

toilet, a sink (usually the hot water does not work), a small desk with a stool, and a few

personal items.  Mr. Mosqueda spends approximately 13 hours in his cell per day, often

more if there are issues requiring further lockdown, which can result in days at a time.  If

he is not in his cell, he is out in his unit, which is a small area containing a table, shower,

TV, digital clock, commissary kiosk, and two phones, only one of which is generally

accessible; one of the phones has a video system.  Radios are available to purchase for

$25.00.  Video visits cost $5.00 per 20-minute visit; phones cost approximately $7.50 per

20-minute call.  In the commissary kiosk, inmates can purchase hygiene items, such as

bar soap (70¢–$1.23 per bar) and razors (25¢), food, stamps, and batteries ($5.35 for a 4-

pack) for the radios.

---

[15] Id.
[16] Id.

The inmates can go to recreation for up to one hour per weekday; this is not available on the weekends.  Mr. Mosqueda's world consists of his cell and the unit for 23 hours per day or more.  The only escape is when his lawyer comes to see him.  In his cell, he can have no more than six books.  He can have a few photos, legal mail, and commissary items.  Nothing else.  He does not see the sun or breathe fresh air unless he is being transported to and from court.

Over the past year, Mr. Mosqueda's unit has been subjected to many "shake-downs."  This is a random search of everyone's cells.  When this occurs, all the inmates must leave their cells and are patted down by jail staff.  They are handcuffed and sat at the steel table in the unit.  Then the staff go through everyone's jail cells searching for contraband.  When they are finished, the inmates are unhandcuffed and free to return to their cells.  The cells are typically trashed after the search, so the inmates then put their cells back together.  During one "shake-down," Mr. Mosqueda had been inquiring about books when one of the male guard staff walked over to intimidate Mr. Mosqueda.  Eventually, the incident ended and Mr. Mosqueda returned to his cell.

For Mr. Mosqueda, the jail has not been consistently administering his medications.  He is supposed to receive Zoloft daily for depression and anxiety, but the jail has missed multiple doses.

He has tried to help people.  There was an ICE inmate who only spoke Spanish with very little broken English.  None of the staff in the unit spoke Spanish.  Mr. Mosqueda acted as a translator between the inmate and the staff in their cell and unit.  He has volunteered for other similar inmates to assist them.

In 2019, Mr. Mosqueda was getting clothing that was either too small or too large. He would submit written requests to be given correctly sized clothing; one time he received his note back with "No" written on it. Sometimes Mr. Mosqueda's clothes would have words written them, such as "faggot," "dick sucker," "I like horse dick," etc. in large block letters in graphite pencil. Other inmates in his unit also had these problems. Mr. Mosqueda and his fellow inmates must then try to wash the writing out.

Throughout the end of February and beginning of March 2020, one inmate in Mr. Mosqueda's unit abused a transgender inmate. On March 9, 2020, Mr. Mosqueda stood up for the transgender inmate against the threats of other inmates. The abusive inmate threatened to send in a complaint to the staff against Mr. Mosqueda. His threat implied that if Mr. Mosqueda is moved out of this particular unit, he will be in serious danger.

Thus, Mr. Mosqueda will request a hard-time variance.

## VII.    Cost to Incarcerate Mr. Mosqueda

> In 1984, at the start of my career, 188 people were imprisoned for every 100,000 inhabitants of the United States. Other Western industrialized countries had roughly equal numbers. By 2010 that figure had skyrocketed to 497 people imprisoned in the U.S. for every 100,000 inhabitants. Today, we imprison more of our people than any other country in the world.
>
> How did 'the land of the free and the home of the brave' become the world's biggest prison ward? The U.S. now houses 5% of the world's population and 25% of its prisoners. Either our fellow Americans are far more dangerous than the citizens of any other country, or something is seriously out of whack in the criminal-justice system. . . .

~U.S. District Judge Michael A. Ponsor[17]

Confirming Judge Ponsor's statement, statistics show that in the past 90 years, the general prison population has soared:[18]



Compared to the rest of the world, as stated above by Judge Ponsor, the United States imprisons a shocking number of its citizens, showing that we imprison more people than Rwanda and Russia and far more than Spain, China, and India:[19]



---

[17] Ponsor, Michael A. The Prisoners I Lose Sleep Over. The Wall Street Journal. Feb. 13, 2014.
[18] The Sentencing Project, https://www.sentencingproject.org/wp-content/uploads/2016/01/Trends-in-US-Corrections.pdf (citing Bureau of Justice Statistics *Prisoners Series*) (last visited Feb. 17, 2020).
[19] The Sentencing Project, https://www.sentencingproject.org/wp-content/uploads/2016/01/Trends-in-US-Corrections.pdf (citing Walmsley, R. (2018). World Prison Brief. London: Institute for Criminal Policy Research. Available online: http://www.prisonstudies.org/world-prison-brief) (last visited May 9, 2019).

Justice Kennedy made a similar statement to Judge Ponsor: "Our resources are misspent, our punishments too severe, our sentences too long, . . . the sentencing guidelines are responsible in part for the increased terms . . . [and they] should be revised downward." Statement of Justice Anthony Kennedy, ABA Annual Meeting (Aug. 9, 2003).

The final PSI (p. 25, ¶ 97) shows that the expense of putting an offender on probation pales in comparison to incarcerating that person:

|  | Bureau of Prison | Community Corrections | Supervision by Probation |
|---|---|---|---|
| Daily | $103.00 | $95.00 | $12.00 |
| Monthly | $3,121.00 | $2,874.00 | $373.00 |
| Annually | $37,448.00 | $34,493.00 | $4,472.00 |

In 2017, the United States spent $6,139,489,683.55 on its 186,693 individuals involved in the Bureau of Prisons.[20] Not including support costs, the United States spent $24,262.00 per inmate at a minimum-security prison in 2017 and $40,347.00 per inmate at a high-security prison in 2017.[21] If Mr. Mosqueda is given 360 months (statutory maximum)— 30 years—the United States will spend $727,860 if he is sent to a minimum-security prison and $1,210,410 if he is sent to a high-security prison. If Mr. Mosqueda is given 180 months (statutory minimum)—15 years—the United States will spend $363,930 if he is sent to a minimum-security prison and $605,205 if he is sent to a high-security prison. For a nonviolent offense, this is an enormous amount money for the United States to spend locking Mr. Mosqueda in a cell.

---

[20] Federal Prison System: Per Capita Costs: FY 2017, https://www.bop.gov/foia/docs/fy2017_per_capita_costs.pdf (last visited May 9, 2019).
[21] Id.

## **CONCLUSION**

For the foregoing reasons, Mr. Mosqueda respectfully requests that this Court

sentence him to the mandatory minimum 15 years in prison.


Respectfully submitted,

**RYAN GARRY, ATTORNEY, LLC**


Dated:  March 30, 2020                          s/ Ryan Garry

Ryan P. Garry (Attorney No. 0336129)
Elizabeth R. Duel (Attorney No. 0393619)
Attorneys for Defendant
333 South Seventh Street, Suite 2350
Minneapolis, MN 55402
Phone: (612) 436-3051
Fax: (612) 436-3052
ryan@ryangarry.com | elizabeth@ryangarry.com