UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 19-CR-270 (PJS)

UNITED STATES OF AMERICA,

        Plaintiff,

v.

JOSIAH RAUL MOSQUEDA,

        Defendant.

**GOVERNMENT'S SENTENCING POSITION PLEADING**

The United States of America, by and through its attorneys, Erica H. MacDonald, United States Attorney for the District of Minnesota, and Lindsey Middlecamp, Special Assistant United States Attorney, hereby files this sentencing position pleading in support of its request that the Court sentence Defendant Josiah Raul Mosqueda to a term of 360-months' imprisonment followed by a lifetime of supervised release. The record evidence shows that Mosqueda is a serial sexual predator and has continually preyed upon and exploited children for more than half a decade prior to his arrest. He insinuated himself into and then abused a position of trust, and in that role, he groomed particularly vulnerable children both in-person and online. He manipulated children into silence, and at times, even bartered their exploitation in exchange for things they needed, ranging from emotional support to financial assistance. In light of these serious crimes, a sentence of 360-months' imprisonment is sufficient, but not greater than necessary to comply with the basic purposes of criminal punishment: deterrence, incapacitation, just punishment, and rehabilitation.

## I.     BACKGROUND FACTS

The Government adopts and incorporates the factual background as set forth in the Presentence Investigation Report. (Dkt. No. 42 ("PSR") ¶¶ 5-11; 37-42.)[1] Mosqueda pled guilty on December 6, 2019 to one count of Production and Aiding and Abetting in Production of Child Pornography in violation of 18 U.S.C. §§ 2251(a) and (e). Mosqueda also admitted in his written plea agreement to numerous instances of sexually exploiting minors in addition to the single charged victim. (Dkt. No. 33 ¶ 2.)

Mosqueda is a serial sexual predator. For at least seven years, he intentionally sought roles in which he had access to children and used those roles to sexually exploit at least ten victims. Although he claims now to accept that his conduct was wrong, he still characterizes his pattern of sexually exploiting minor boys as one rooted in a well-intentioned desire to "help" LGBTQ youth learn "who they are" and how to be "happy." (PSR ¶ 18.) The sole nugget of truth within that misguided characterization is this: Mosqueda knew that LGBTQ children or children questioning their identities are uniquely vulnerable. He recognized that their unique vulnerability made them trusting of him as an adult figure. It made them unlikely to report him for his conduct to friends or family for fear of stigma and shame. Thus, it made them ideal victims for manipulation and sexual exploitation. Rather than "helping" these children learn to navigate healthy relationships, Mosqueda groomed and coached them into graphic sexual discussions and conduct for his

---

[1] As set forth in the notice filed on March 13, 2020 (Dkt No. 53), BCA Special Agent Rachel Nelson or her designee will testify at the forthcoming sentencing hearing to establish pertinent investigative details noted herein to the extent they are not included in the PSR.

2

own sexual gratification, ensuring that their developing years as young teens were punctuated by sexual abuse by a trusted adult.

A. <u>Charged Conduct Involving Minor 1</u>

Mosqueda's first documented communication with the charged victim, Minor 1, featured Minor 1 confiding in Mosqueda about depression, anxiety, and suicide. (PSR ¶¶ 9-10.) Minor 1 was only fifteen years old at the time. Mosqueda assured Minor 1, "I'm here for you man if you ever need it. [I've] unfortunately had experiences with such [things]." Communications only ten days later show Mosqueda again assuring Minor 1 "you can always text me if you need me," shortly before directing the conversation to sexual subject matter, telling Minor 1 "you riding my dick and me riding [another minor's] dick is such a hot fantasy of mine." (*Id.*)

The next day, Minor 1 disclosed suicidal ideation. Mosqueda assured Minor 1, "Darling I'm always here for you." By the next night, Mosqueda was pressuring Minor 1 to send Mosqueda pornographic images of Minor 1, entreating, "Not even a wee bit of an aid to help me cum?" (*Id.*)

Later that same month, the pattern repeated. Minor 1 again expressed suicidal ideation, and Mosqueda wrote, "babe, please don't do it." Only several days later, Mosqueda messaged Minor 1 and requested sexually explicit photos of Minor 1. Upon receiving the first image, Mosqueda wrote, "id kill to run my tongue along your balls and the underside of them." Apparently sensing the conduct had been unwanted, Mosqueda wrote the next day, "I'm sorry, I'm an emotional wreck this morning. Are you and I ok?" (*Id.*)

3

These exchanges, though only a small snapshot of seven years of conduct across at least ten victims, illustrate Mosqueda's manipulation of trust and vulnerability for his own prurient purposes. His concern was not for Minor 1's wellbeing; it was to ensure Minor 1 viewed Mosqueda as a person to talk to during times of need, only for that trust to be exploited to induce Minor 1 to produce and send Mosqueda child pornography.

B.      Additional Conduct Involving Known Victims

Mosqueda himself has admitted that Minor 1 was only one of many children that Mosqueda preyed upon, and the plea agreement summarizes conduct related to Minors 2 through 10. (Dkt. No. 33 ¶ 2.) Although Mosqueda's statement accepting responsibility states that electronic communications made it easy for him to forget his victims' ages (PSR ¶ 18), the record is replete with evidence that Mosqueda never forgot he was preying on children, and even relished it, while coaching his victims to lie about their age or otherwise ensure his conduct remained secret:

- Mosqueda acknowledged to Minor 1, "Look, I'm older, can't change that lol."

- In response to an international victim, AA, telling Mosqueda he was only 16, Mosqueda responded, "You can still be attractive and be 16 lol."

- Mosqueda bragged to Minor 6, "Between you and me, I have done stuff with underage guys from Grindr all the time, especially if they are up front about them being under 18. But that is a calculated risk I take."

- In discussing an in-person meeting with Minor 6, Mosqueda advised Minor 6 (then 16 years old) to tell anyone who asks that he was 18 or 19.

- Mosqueda told Minor 8, "I tend to not be super attracted to older guys sadly Unfortunately quite into younger dudes lol."

- Mosqueda directed Minor 2, age 13, that "you literally can't show anyone. I would go to jail and never be able to teach or work in a school lol." After sending images of his penis, Mosqueda told Minor 2 it was a "secret you must take to the grave."

- In a Facebook message to another minor, Mosqueda bragged, "Lately I've totally been into having fun with younger guys and them calling me papi and me calling them boy."

(PSR ¶¶ 37-39.)

In his statement to the Court, Mosqueda claims that he "tried [his] best" to maintain boundaries but that his actions "snowballed." (PSR ¶ 18.) The record shows the exact opposite. Rather than limiting his communications with minors to those natural or necessary to his volunteer or employment roles, Mosqueda intentionally sought out inappropriate, private conversations with teenagers across a variety of social media and messaging applications. He repeatedly bartered sexually explicit contact or imagery for gifts or other assistance. One victim has reported that Mosqueda committed hands-on sexual offenses against him starting when he was only 14 years old. Communications with several other victims show Mosqueda taking steps to arrange in-person contact, with Mosqueda offering to provide transportation or economic favors in exchange for sexual contact. This is not the conduct of a person attempting to maintain boundaries with children. Nor does his pattern of behavior show a gradual escalation with one minor that "got out of hand"; rather, the record reflects a successive habit of intentionally targeting new minors, online and in person, over the course of many years.

A year before being arrested, Mosqueda was directly confronted about his criminal conduct by a peer in February 2018. Upon being so confronted, Mosqueda wrote, "I

swear . . . I am not that person anymore," and insisted, "I now do view my duty to serve and empower youth." (PSR ¶ 39.) Mosqueda simultaneously confided with another peer about his anxiety over the confrontation, and the two discussed whether any of Mosqueda's former victims were "angry," had "proof," or had threatened action against Mosqueda. (PSR ¶ 40.) Mosqueda was apparently concerned about the potential incrimination of even that discussion, as he requested it continue on the ephemeral messaging platform "Snapchat." (*Id.*)

Yet, as Agent Nelson will testify at sentencing, Mosqueda's predatory conduct not only continued but escalated. By April 2018, only two months after assuring his peer that he had changed and that he only wanted to "empower" youth, Mosqueda pressured a 15-year-old boy to exchange in-person sexual contact as payment for Mosqueda fixing the boy's broken phone. Mosqueda repeatedly directed the child to switch to "private" Facebook messaging before telling him he could only help him with his phone if he committed to having sexual contact the same night as the errand; that it was a "fair exchange," and that if the boy did not agree, Mosqueda was "good and done" with him.

By August 2018, Mosqueda was grooming yet another 13-year-old boy, and by November 2018 he coached that boy to engage in phone sex with another minor male in order to send Mosqueda sexually explicit images from the other minor. By the time his communications with that minor ended, he was persuading the boy that if he allowed Mosqueda to "fuck" him, Mosqueda could "cast a spell" with the boy's semen to make him more attractive to others.

6

In December 2018, Mosqueda created a new Twitter account, "wetboyfantasies," which he used to contact at least two 16-year-old boys, requesting images from one. Through Twitter, Mosqueda also communicated with a minor boy from Mexico, who he paid for additional child pornography.

In January 2019, Facebook terminated Mosqueda's account because he had been using it to exchange sexually explicit images with minors. Mosqueda suspected that was why his account was terminated, and admitted to his sister that it was likely because he had been using it to communicate with someone underage. Approximately one hour after being notified that his Facebook account had been closed due to his violations of terms and conditions, Mosqueda created an Instagram account. In the coming weeks, Mosqueda used that new Instagram account to initiate conversations with two 14-year-old boys Mosqueda had met where he worked. While engaging in this predatory conduct in private, Mosqueda continued to cultivate a public appearance of legitimacy and trust. He attended graduate school for social work, and described himself on his Linked-In profile as "…a sociologist dedicated to assisting youth from all walks of life in achieving success. I am passionate about the rights and safety of LGBTQ youth . . . "

Mosqueda claims that throughout his conduct, he wanted help but did not seek treatment for his conduct because he feared being reported to law enforcement. (PSR ¶ 18.) However, that self-serving excuse defies belief: fear of being reported to authorities did not deter Mosqueda from actively preying on multiple new children even after being confronted by peers in 2018, and it did not deter Mosqueda from seeking out additional private conversations via Instagram or Twitter after Facebook terminated his account in 2019.

7

Furthermore, Mosqueda was consistently attending therapy sessions from 2015 until his arrest in 2019, and at no point in those four years did he disclose his inappropriate contacts, despite having a consistent therapist who reports that one of their major areas of treatment and discussion between the two was boundary-setting. (PSR ¶ 61.)

The record is clear: Mosqueda knew what he was doing was wrong and was, in fact, sexually gratified by the power dynamic of exploiting children. He knew LGBTQ youth were particularly vulnerable, and he targeted them intentionally. When faced with his conduct directly, he did not stop. Instead, he escalated, created new social media accounts in order to facilitate his criminal conduct, and in all likelihood would have continued had he not been arrested in March 2019.

C.  Mosqueda's Possession of Child Pornography

Further demonstrating Mosqueda's knowing appetite for child pornography is his admitted possession of child pornography from third-party sources. Upon his arrest and execution of a search warrant, law enforcement recovered multiple image and video files of suspected child pornography that was previously produced and is widely available and circulated on the Internet. The National Center for Missing and Exploited Children (NCMEC) confirmed Mosqueda's possession of at least 332 images and 23 videos containing verified child pornography of known victims from 64 different series.[2] (PSR

---

[2] Agent Nelson has identified a discrepancy between the numbers contained in several reports generated by NCMEC. The PSR description of Mosqueda's files was derived from one such report, but Agent Nelson will testify at sentencing that the report understated the number of images and files.

¶ 42.) Agent Nelson will testify at sentencing that the files included depictions of children as young as infants being sexually abused.

## II. ARGUMENT AND CITATION OF AUTHORITIES

In 1984, Congress created the United States Sentencing Commission. *Mistretta v. United States*, 488 U.S. 361, 362, 366-367 (1989). The Sentencing Reform Act of 1984, 18 U.S.C. § 3551 *et seq.*, directed that Commission to promulgate uniform guidelines that would be binding on federal courts at sentencing. *Id.* at 367. One purpose of the Guidelines was to address and eliminate sentencing disparities among similarly situated offenders. *See Koon v. United States*, 518 U.S. 81, 113 (1996); 28 U.S.C. § 991 (b)(1)(B). Congressional statutes instruct the Commission to carry out the objectives of 18 U.S.C. § 3553(a). *Rita v. United States*, 551 U.S. 338, 348 (2007). Significantly, as the United States Supreme Court observed in *Rita*:

> The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill this statutory mandate. They also reflect that the fact that different judges (and others) can differ as to how best to reconcile the disparate ends of punishment. . . . [I]t is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives

551 U.S. at 349, 350. Consequently, although the Guidelines are no longer mandatory, *see United States v. Booker*, 543 U.S. 220, 245-258 (2005), "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" at sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). "The post-*Booker* federal sentencing scheme aims to achieve uniformity by ensuring that sentencing

9

decisions are anchored by the Guidelines and that they remain a meaningful benchmark through the process of appellate review." *Peugh v. United States*, 569 U.S. 530, 541 (2013).

In *Gall*, the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine an appropriate sentence. 552 U.S. at 49-50; *see also United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors.").

A.   The Guidelines Range

The United States agrees with the PSR's technical application of the Guidelines, other than the conclusion that a 2-level enhancement for a uniquely vulnerable victim does not apply under U.S.S.G. §3A1.1. The United States maintains that the enhancement should apply because the charged victim was uniquely vulnerable to Mosqueda's criminal conduct because of his LGBTQ status, depression, anxiety, and suicidal ideations, and because Mosqueda was well aware of the particular vulnerability at that intersection of youth, sexual identity, and mental health. Regardless of whether or not the vulnerable victim enhancement is applied, Mosqueda's Guidelines range sentence would remain 360 months to life imprisonment, subject to the statutory maximum of 360 months.

B.   <u>An Examination of the 3553(a) Factors Demonstrates that a Sentence of 360 Months' Imprisonment Is Appropriate</u>

The district court may not assume that the Guidelines range is reasonable, but instead must make an individualized assessment based on the facts presented. *Gall*, 552 U.S. at 50. In addition to the advisory guidelines range, Section 3553(a) requires the Court to analyze a number of factors, including the history and characteristics of the defendant, the nature and circumstances of the offense, the need for the sentence to reflect the seriousness of the offense, the need for deterrence, and the need to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a). An analysis of these factors shows that a sentence of 360 months' imprisonment is appropriate.

1. <u>Mosqueda's History and Characteristics</u>

Section 3553(a)(1) instructs the sentencing court to consider the history and characteristics of the defendant.[3] Mosqueda is a serial predator who has, for over seven years, abused his access to children (both through his professional and social relationships and the Internet) to sexually exploit them. Mosqueda claims his actions arose from loneliness and a lack of role models in his life, but also describes having had a healthy, loving relationship with his mother and grandparents as constant support systems. In addition to multiple supportive family members, Mosqueda had the unique benefits of a

---

[3] Section 3553(a)(1) also instructs the sentencing court to consider "the nature and circumstances of the offense." To a large extent, "the nature and circumstances of the offense component" overlaps with the next listed consideration, which is "the need for the sentence imposed -- to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." *See* 18 U.S.C. § 3553(a)(2)(A). Accordingly, these factors are discussed together below.

higher education, and pursued studies in the fields of social work and women and gender studies, as well as professional opportunities in educational settings. Additionally, he had access to regular mental health counseling from 2015 through 2019.

Unfortunately, Mosqueda did not use those advantages to better himself or his community; instead, he spent years pursuing inappropriate relationships with minor boys, with communications reflecting a pursuit of in-person contact in addition to online exploitation. Mosqueda knew his conduct was wrong, and he persisted. His communications allude to additional relationships with underage boys through a dating app, Grindr, which victims may never be known to law enforcement.

In sum: Mosqueda is a serial predator with a consuming passion for sexually explicit communications with children and viewing child pornography. His history shows that he determined that he would both possess child pornography involving unknown victims, and induce pornography from known victims, both with and without his subjects' consent or knowledge. His history and characteristics show that he prioritizes his own selfish prurient interests over human decency or the safety of children, even while wearing the mantle of a socially-conscious activist for the vulnerable and advocate for troubled or disenfranchised LGBTQ youth. Thus, his history and characteristics compel a sentence of 360 months' imprisonment.

  2. <u>Nature and Circumstances of the Offense/Just Punishment</u>

The second factor a sentencing court must consider is "the need for the sentence imposed -- to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment." 18 U.S.C. § 3553(a)(2)(A). As stated, this requirement extends

beyond, but also overlaps to some extent with, the "nature and circumstances of the offense" component of Section 3553(a)(1). The Section 3553(a)(2)(A) consideration is the "just deserts" concept, which carries the need for retribution, the need to make the punishment fit the crime, and the need not just to punish, but to punish justly. "[I]t is another way of saying that the sentence should reflect the gravity of the defendant's conduct." Committee on the Judiciary, Report No. 98-225, 98 Cong. 1st Sess. 1983, p. 75. Here, Mosqueda induced and produced child pornography over the course of many years, and the charged conduct was merely one instance in a long pattern of similar behavior.

Child sex crimes are among the most egregious and despicable of societal and criminal offenses. The Supreme Court has long recognized that childhood sexual abuse has devastating and long-lasting effects on its victims. *See New York v. Ferber*, 458 U.S. 747, 758 n.9 (1982) ("It has been found that sexually exploited children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults."). Children rarely fully recover from the trauma of sexual abuse. A. Perry and D. DiLillo, *Child Sexual Abuse*, 147, in NA. Jackson, Encyclopedia of Domestic Violence (2007).

The life-long trauma that Mosqueda has inflicted on the minor victims and their families is difficult to measure, as the full scope of victims is unknown and those who are known are still developing teenagers. Compounding some of the trauma is that Mosqueda's victims, many who identify as LGBTQ, were forced to have intimate details of their sexual identifies disclosed at a timeframe not their own. They have been put in the impossibly difficult position of either processing their pain in complete isolation, or risking alienation,

rejection, or retribution by their families, who may be unwilling or unable to offer support free from cultural or religious shame against the children's sexuality. Mosqueda knew this dynamic well when he targeted the boys: he offered multiple victims his own home as a safe space in the event their families discovered their sexuality and kicked them out of their homes. The conduct is particularly egregious given Mosqueda's claimed passion for promoting the safety and health of LGBTQ youth. The nature of the offense compels a sentence of 360 months' imprisonment.

    3.    The Need for Deterrence

In this case, there is a need for both individualized and general deterrence. Individualized deterrence is that which discourages Mosqueda from ever committing such a crime again. Here it is clear that Mosqueda does not truly appreciate his accountability for his actions; although he has expressed remorse and cooperated in this prosecution, he continues to contextualize his actions as inadvertent boundary-crossing rather than the intentional predation that it is. Only a significant sentence is likely to deter Mosqueda from engaging in this behavior again.

A significant sentence is also important as a general deterrent. General deterrence is the public response necessary to deter other people from committing similar crimes. "Congress has specifically made general deterrence an appropriate consideration under 3553(a)(2)(B), [it is] one of the key purposes of sentencing." *Ferguson v. United States*, 623 F.3d 627, 631-32 (8th Cir. 2010). Moreover, Congress, the United States Supreme Court, and the United States Sentencing Commission have made clear that general deterrence is a very important sentencing goal in child pornography offenses. *See United*

14

*States v. Irey,* 612 F.3d 1160, 1206 (11th Cir. 2010) ("The most expeditious if not the only practical method of law enforcement may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product") (*citing Ferber*, 458 U.S. at 760). Child pornography is a pervasive blight on society that continues to spread.

In *United States v. Goldberg*, 491 F.3d 668 (7th Cir.), *cert. denied*, 552 U.S. 1041 (2007), the court discussed the goal of general deterrence:

> Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded—both consumed himself and disseminated to others. The greater the customer demand for child pornography, the more will be produced. Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory factor. The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so more will be produced.

491 F.3d at 672. The Court is in a position to send a strong message to people like Mosqueda who seek and derive sexual pleasure from exploiting children and collecting depictions of the abuse and victimization of children. A sentence of 360 months' imprisonment is appropriate as both an individual deterrent and a general deterrent.

    4.    <u>A Sentence of 360 Months' Imprisonment Is Necessary to Protect the Public from Further Crimes of this Defendant</u>

In sentencing Mosqueda, the Court must weigh the need to protect the public from his future crimes. *See* 18 U.S.C. § 3553(a)(2)(C). "The basic task is to predict the likelihood that the offender will commit further offenses, assess the potential seriousness of those offenses, and determine the need to incapacitate the offender as a prophylactic measure."

15

*Irey*, 612 F.3d at 1238. There are a multitude of studies and research to support the proposition that a hands-on offender like Mosqueda is a danger to the community who is likely to re-offend. *See* Krista Blaisdell, Note, Protecting the Playgrounds of the Twenty-First Century: Analyzing Computer and Internet Restrictions for Internet Sex Offenders, 43 Va. U.L. Rev. 1155, 1192, n.150 (2009) (compiling Congressional statements regarding the high risk of recidivism among child sex offenders); *see also Smith v. Doe*, 538 U.S. 84, 103 (2003) (noting "[t]he risk of recidivism posed by sex offenders is 'frightening and high'"); *McKune v. Lile*, 536 U.S. 24, 33 (2002) ("When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault"); *United States v. Garthus,* 652 F.3d 715, 720 (7th Cir. 2011) ("Statistical analysis of sex crimes has shown that the best predictor of recidivism is . . . sexual interest in children . . . . A pedophilic sex offender who has committed both a child-pornography offense and a hands-on sex crime is more likely to commit a future crime, including another hands-on offense, than a defendant who has committed only a child-pornography offense"), *cert. denied*, __U.S.__, 132 S.Ct. 2373 (2012); *Irey*, 612 F.3d at 1214 (noting that the "threat of recidivism by a pedophile who has sexually abused a child is 'appalling'").

Even without these studies, the Court can conclude that Mosqueda is likely to recidivate. Mosqueda has been preying on minor boys for years. He was confronted on multiple occasions with the consequences of his actions—first by a peer, and later by Facebook shutting down his account, and he continued and escalated his conduct each time. And, at his own cost, Mosqueda commissioned a psycho-sexual evaluation which

concluded Mosqueda presents an Above-Average risk for recidivism. In light of the foregoing, a sentence of 360 months' imprisonment is necessary to protect the public.

D.  Defendant Has Stipulated to Restitution

Pursuant to the written plea agreement, Mosqueda agreed to pay $10,000 to any of his production victims who requested restitution, and $3,000 to any other victims of child pornography that Mosqueda possessed who requested restitution. Based on the requests received by the United States and the foregoing agreement, Mosqueda's restitution obligations are as follows:

- $10,000 each for the three production victims who have notified the United States of restitution claims;

- $3,000 each for the victims of the "Surfer Hair," "Lighthouse," and "Sponge B" series.

Particularized contact information and payment details for the restitution recipients will be provided to the United States Probation Office.

E.  A Supervised Release Term of Life Is Appropriate Under the Circumstances Present Here

Supervised release "is a unique method of post-confinement supervision," *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991), that "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). It "is not punishment in lieu of incarceration." *United States v. Granderson*, 511 U.S. 39, 50 (1994). Rather, "congressional policy in providing for a term of supervised release after incarceration is to improve the odds of a successful transition from the prison to liberty," *Johnson v. United States*, 529 U.S. 694, 708-09 (2000).

In the main, Congress authorized only short terms of supervised release. For Class A felonies, the most serious category of federal offenses, a supervised release term ordinarily may not exceed five years. 18 U.S.C. § 3583(b)(1). Child exploitation crimes, however, fall into a discrete group of offenses for which Congress went further, mandating a minimum supervised release term of five years and authorizing a maximum term of life. *Id.* § 3583(k). Of course, this suggests that Congress saw a grave danger to public safety from individuals who seek to exploit children, beyond the danger posed by a run-of-the-mine felon. Indeed, the Guidelines urge district courts to impose the maximum supervised release term available for sex offenders like Mosqueda. *See* U.S.S.G. §5D1.2(b).

As set forth above, Mosqueda has demonstrated escalating recidivism over the course of seven years, even after having frank confrontations about the consequences and harms of his actions. For years, Mosqueda attended regular therapy sessions and apparently discussed the importance of boundary-setting, while sexually exploiting young boys over the same period of time. His own statements portray a person who, even knowing his actions were wrong, was unable or unwilling to change his behavior. A life term of Supervised Release is necessary to protect the public from Mosqueda and to ensure his compliance with the law.

### III.   CONCLUSION

For the reasons set forth above, the Government respectfully asks the Court to sentence Mosqueda to 360 months' imprisonment, followed by a life term of supervised release. The requested sentence is consistent with the Section 3553(a) factors. Most importantly, under all the facts and circumstances of this case, it is also fair and just.

Dated: April 3, 2020

           Respectfully Submitted,

           ERICA H. MacDONALD
           United States Attorney

           *s/ Lindsey E. Middlecamp*

           BY:
           LINDSEY MIDDLECAMP
           Special Assistant U.S. Attorney
           600 U.S. Courthouse
           300 South Fourth Street
           Minneapolis, MN 55415
           (612) 664-5600
           Attorney No. 0392589